208 A.2d 501 (1965)
Harvey ALCOTT, Rose E. Alcott, Dale Distributing Co., Inc., Morice Haymes, Sidney Susswein and Morton Mainzer, suing individually and as stockholders of P. R. M., Inc., (formerly Associated Artists Productions Corp.) and on behalf of themselves and other stockholders of P. R. M., Inc., (formerly Associated Artists Productions Corp.), similarly situated, and in the right of P. R. M., Inc., (formerly Associated Artists Productions Corp.), Plaintiffs Below, Appellants,
v.
Eliot HYMAN, P. R. M., Inc., (formerly Associated Artists Products Corp.), a corporation of the State of Delaware, United Artists Associated, Inc., a corporation of the State of Delaware, and Gotham Television Film Corporation, a corporation of the State of Delaware, Defendants Below, Appellees.
Supreme Court of Delaware.
March 8, 1965.
Hugh M. Morris and William S. Megonigal, Jr., of Morris, Nichols, Arsht & Tunnell, Wilmington, Burton H. Brody, of Galef & Jacobs, New York City, and Davies, Hardy & Schenck, New York City, for appellants.
Louis J. Finger, of Richards, Layton & Finger, Wilmington, and Jay H. Topkis, of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for appellees United Artists Associated, Inc. and Gotham Television Film Corporation, and Stillman & Stillman, New York City, for appellee Eliot Hyman.
WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.
*502 HERRMANN, Justice:
The plaintiffs are stockholders of P. R. M., Inc., a Delaware corporation, the name of which was Associated Artists Productions Corp. (hereinafter "AAP") at the time of the transaction here in question. The plaintiffs brought this action, individually and derivatively, to challenge the transaction whereby the defendant United Artists Associated, Inc. (hereinafter "UAA"), acquired all of the assets of AAP except cash in bank. Certain defendants moved for summary judgment of dismissal. The plaintiffs moved for partial summary judgment. The Vice Chancellor granted the defendants' motion and denied the plaintiffs' motion. See Alcott v. Hyman, Del. Ch., 184 A.2d 90 (1962). The plaintiffs appeal.
*503 The facts are as follows:
AAP was a Delaware corporation engaged in the business of distributing for television use motion picture films originally produced for theatrical exhibition. A film library constituted the main asset of the corporation and consisted principally of feature films produced between 1919 and 1949 by Warner Brothers Studios and a group of "Popeye" cartoons. In addition to television rights, AAP owned the literary, theatrical, motion picture remake and radio adaptation rights in the films. AAP was a publicly held corporation, its stock being traded on the American Stock Exchange.
United Artists Corporation (hereinafter "United Artists") was a large producer and distributor of motion pictures which often obtained grants of television rights in its distribution agreements. It is not a defendant.
During the latter part of 1957, United Artists commenced negotiations with the defendant Eliot Hyman, then president of AAP, and with AAP's principal stockholders, Louis Chesler and Maxwell Goldhar, seeking to acquire AAP's film library and distribution rights. Chesler and Goldhar, who held or controlled 41% of AAP's stock, were also negotiating for the sale thereof with National Telefilm Associates, Inc. (hereinafter "NTA"), another company engaged in distributing motion pictures for television use. After carrying on competitive negotiations with United Artists and NTA for several months, Chesler, Goldhar and certain associates agreed to sell 700,000 shares of AAP stock, of 1,639,720 shares then outstanding, to the defendant Gotham Television Film Corporation (hereinafter "Gotham"), a Delaware corporation wholly owned by United Artists. The price was to be $6.00 per share in cash plus a commitment to deliver subsequently $6.00 worth of Gotham's subordinated debentures or promissory notes. As a condition of the sale, in order to maximize the post-tax return to AAP's stockholders from the sale of AAP's assets, United Artists agreed to purchase the bulk of AAP's outstanding stock at the same price and terms and to use all of the stock acquired as consideration for the purchase of the assets. In this way, it was thought, AAP would be able to avoid the capital gains tax it would have to pay if it were to sell its assets for cash. Litigation initiated by NTA halted the transaction for a time. NTA claimed to hold a contract for the purchase of the Chesler-Goldhar stock at a price per share consisting of $4.375 in cash, $4.40 in a NTA subordinated indenture and a 1/10 share of NTA common stock. During the litigation, both United Artists and NTA made further competitive proposals to AAP'S board of directors, president and controlling stockholders.
In August 1958, the Chesler-Goldhar group agreed to a revision of their agreement with United Artists permitting settlement of the NTA litigation and consummation of the United Artists transaction. Under the revision, Chesler and Goldhar would receive $10.62 per share in cash, and their associates would receive $11.19 per share.
United Artists then proceeded to acquire the additional stock of AAP needed under the agreement and it formed UAA, a Delaware corporation, for the purpose. Two of the four directors of AAP, Eliot Hyman and Henry Zittau, became directors of UAA and entered into contracts of employment with UAA. At the time of the transaction, Hyman's attorney was the third director of AAP and Hyman's son was an officer of that company.
On September 11, 1958, UAA mailed to all AAP security holders an invitation to tender their securities to UAA at $11.19 per share for stock and at related prices for certain warrants and convertible debentures. The invitation was accompanied by a Report, modeled on a SEC registration statement, which outlined UAA's plan under the agreement and gave to AAP security holders a full and complete statement of the details of the transaction. The managements *504 of both UAA and AAP offered in this communication to supply any further information on written or telephone request. Under the invitation, UAA offered to purchase the tendered stock at the specified price and to use such stock, together with additional cash, to buy from AAP all of the latter's assets except cash, provided that at least 80% of the outstanding AAP stock was tendered and that AAP's directors, stockholders and debenture holders approved. The stockholders were informed that, as part of the transaction, UAA would assume all of AAP's liabilities and that the cash to be paid with the stock would be sufficient to redeem all AAP debentures not tendered to UAA and $11.19 for each share of AAP stock not tendered left outstanding.
The proposal was approved unanimously by AAP's directors. AAP's debenture holders voted unanimously for the debenture changes necessary to implement the proposal. At a special AAP stockholders' meeting, of 2,112,484 shares entitled to be voted, 1,590,040 shares were voted in favor of the UAA proposal and 5,556 against.
Thereafter, the AAP security holders acted almost unanimously in tendering their securities pursuant to UAA's invitation. The offer was accepted by the holders of 97.5% of the stock available for purchase[1], and by the holders of 95.7% of the debentures and 95.3% of the warrants.
The plaintiffs sought to have the consummation of the transaction enjoined in an action in the Supreme Court of the State of New York. That Court refused the injunction, however, stating that "the defendants have acted in a scrupulously fair manner and in accordance with the highest morals of the market place." Alcott v. Hyman, 16 Misc.2d 192, 183 N.Y.S.2d 359, 363 (1958).
The transaction was consummated on October 17, 1958. UAA delivered to AAP all of the securities it had purchased and it assumed all of AAP's liabilities except $51,000. in face amount of debentures. UAA also delivered to AAP sufficient cash so that, at the conclusion of the transaction, AAP had $1,949,734. in its treasury  $11.19 for each of the 174,239 shares remaining outstanding, plus sufficient additional cash to cover the $51,000. in outstanding debentures. In return, UAA received all of AAP's other assets including, of course, the library of motion picture films and distribution rights here in controversy.
In February 1959, this suit was filed[2]. The plaintiffs seek a rescission of the sale of AAP's assets, the declaration of a trust in the assets of AAP now held by UAA in favor of the plaintiffs and members of their class, an accounting from Hyman and UAA, a rescission of the sale to UAA of certain of the stock of AAP and other remedies in the form of damages or allocation of stock. The essence of the plaintiffs' complaint is that the net result of the transaction was to exclude them and other nonassenting stockholders from a profitable business and to leave them holding an equity in the shell of a once going business, the assets of which had been converted into cash sufficient only to cover the stipulated price per share paid to the assenting stockholders. The plaintiffs further claim that the price of $11.19 was grossly inadequate and unfair in view of AAP's past earnings and future potential. Throughout the plaintiffs' claims run the thread of a charge that Hyman had improper motives and personal reasons for favoring the transaction, and *505 that the Chesler-Goldhar group also had improper motives and personal reasons for selling their stock, all of which motives and reasons were unrelated to the true value of the stock. Also running throughout the plaintiffs' complaint is the argument that they were wrongfully deprived of an appraisal of the value of their stock and of the assets of AAP.
Both the plaintiffs and certain defendants moved for summary judgment. The plaintiffs' motion was for partial summary judgment limited to the issue of liability. The defendants' motion sought dismissal of the action.
Upon this appeal, the plaintiffs make a two-pronged attack upon the transaction and the Vice Chancellor's decision.
They first contend that a genuine issue of fact exists as to the fairness of the transaction, precluding summary judgment, by reason of gross inadequacy of price, the presence of Hyman and Zittau on both boards of directors, their status as employees of UAA and the relationships of Hyman's son and attorney to AAP. The plaintiffs contend that, under such circumstances, the defendants had the burden of establishing the adequacy of the price and the fairness of the transaction in a trial of that issue which was improperly denied to the plaintiffs by the court below.
The plaintiffs argue that the defendants had the burden of proving fairness because the case involves interested and self-dealing directors. The defendants reply that, because of stockholder ratification, the burden of proof shifted to the plaintiffs to demonstrate gross disparity between the value of the assets sold and the sale price in order to warrant judicial intervention. The plaintiffs rebut by saying that since Gotham, the wholly owned subsidiary of United Artists, held and voted 837,532 shares of the total of 1,590,040 shares voted in favor of the transaction, Gotham's shares may not properly be counted in arriving at the approval by the independent majority of the outstanding stock which is requisite for a shifting of the burden of proof. The court below did not decide the question. It apparently left the burden of proof of fairness with the defendants, "assuming but not deciding that the board of directors of both the selling and purchasing corporations were not only alternately dominated by United Artists Corporation but that the majority of the outstanding stock voted in favor of the proposition was not entirely independent in the true sense of the word * * *." The Vice Chancellor concluded, however, that the shares held and voted by Gotham should not be disqualified in determining the approval of the transaction by a majority of the outstanding stock, notwithstanding the fact that Gotham was a wholly owned subsidiary of United Artists.
The placement and scope of the burden of proof, in cases involving the fairness of a corporate transaction and the bona fides of interested directors, have been discussed in several cases since this court last spoke on the subject in Gottlieb v. Heyden Chemical Corp., 33 Del.Ch. 82, 90 A.2d 660, on limited reargument, 33 Del.Ch. 177, 91 A.2d 57 (1952). It has been stated that where, upon the trial of the cause, it appeared that the purchaser dominated and controlled the board of directors of the selling corporation, those espousing a sale of corporate assets had the burden of showing its fairness, absent stockholder approval; but that upon a showing of approval of the transaction by a "legally disinterested group of stockholders owning a majority of all of the outstanding shares", the plaintiffs attacking the sale, to be successful upon the trial of the cause, had "the burden of showing that the disparity between the money received and the value of the assets sold is so great that the court will infer that those passing judgment are guilty of improper motives or are recklessly indifferent to or intentionally disregarding the interest of the whole body of stockholders." Schiff v. RKO Pictures Corp., 34 Del.Ch. 329, 104 A.2d 267 (1954). And it has been held that, in support of a motion for summary *506 judgment, in a sale-of-assets case involving alleged director self-dealing and stockholder ratification, the defendant directors could rest upon a submission of the records of the transaction and that, thereupon, it was incumbent upon the plaintiffs to offer proof which would either establish that the transaction was constructively fraudulent or otherwise invalid or which would, in the alternative, show a genuine issue of fact as to the legality of the transaction. Lewis v. Hat Corporation of America, Del.Ch., 150 A.2d 750 (1959). In that case, the court held that, faced with stockholder ratification, the plaintiff minority stockholders of the purchasing corporation "failed either to carry the burden of establishing a shocking disparity between the price paid and the value of the purchased assets or otherwise effectively to discredit data contained in the papers attached to defendants' motion" for summary judgment.
Another development of the problem appears in Manacher v. Reynolds, Del.Ch., 165 A.2d 741 (1960), in which the court distinguished cases involving the question of the fairness of the proposed settlement of a stockholders' action, stating that in "litigation, as opposed to settlements, where an interested board is involved, the court generally does shift the burden to the Objector upon a showing of independent stockholder approval" but that in passing upon the fairness of a settlement such shift would not take place and independent stockholder approval would be considered as but one important factor in resolving the fairness issue. And in Abelow v. Symonds, Del. Ch., 184 A.2d 173 (1962), after denial of cross motions for summary judgment and trial of the issue of fairness of the price paid for the sale of corporate assets, the court held that the burden of proof as to that issue rested on the defendant directors and did not shift to the plaintiff minority stockholders of the selling corporation, notwithstanding stockholder ratification, because almost all of the stock voted in favor of the sale was owned by the buyer; and that, therefore, the transaction lacked the independent stockholder ratification necessary for shifting the burden. See also Saxe v. Brady, Del.Ch., 184 A.2d 602 (1962).
The parties cited certain of the above cases indiscriminately without distinguishing between those decided at the summary judgment stage and those decided after trial of the issue of fairness. It is apparent that clarification is needed as to the burden of proof of the issue of fairness at the summary judgment stage of a case of this nature.
As moving parties for summary judgment, the defendants undertook the burden of demonstrating, with reasonable certitude, that there is no genuine issue as to any material fact relating to the question of fairness and that the defendants are entitled to judgment as a matter of law. The moving defendants had the burden of negating the plaintiffs' claim of unfairness and only when that burden had been discharged did the burden shift to the plaintiffs to come forward with further evidence to demonstrate that there is a genuine issue of material fact upon the question. Compare Howard v. Food Fair Stores, New Castle, Inc., Del., 201 A.2d 638 (1964).
What showing, then, were the defendants obliged to make in support of their burden of proof upon their motion for summary judgment to negate the plaintiffs' claim of unfairness and to demonstrate that they were entitled to judgment as a matter of law?
To carry their burden of proof, since they could not show disinterested AAP director approval, the defendants were obliged to make a prima facie showing, with reasonable certitude, of utmost good faith on the part of AAP's directors and of the scrupulous fairness of the transaction. In scrutinizing the showing of good faith and fairness made by the defendants, and in determining whether their burden of proof in support of their motion for summary judgment has been sustained, two varying degrees *507 of judicial examination are applied, depending upon the existence or nonexistence of ratification of the transaction by the stockholders. In the absence of stockholder ratification, the burden of the defendants is to show to the court's satisfaction, in the exercise of its own judgment after a close scrutiny of the transaction, that the directors in fact acted in utmost good faith and exercised scrupulous fairness. Given such stockholder ratification, however, the defendants' burden is reduced to that of showing that the terms were not so unbalanced as to amount to waste or that the question is such a close one factually as to fall within the realm of the exercise of sound business judgment. See Gottlieb v. Heyden Chemical Corp., supra; Beard v. Elster, Del., 160 A.2d 731 (1960). Not until the apposite burden was discharged by the moving defendants did the burden shift to the plaintiffs to come forward with further evidence to demonstrate that there is a genuine issue of material fact upon the question. See Howard v. Food Fair, supra.
We are of the opinion that the defendants have undertaken and discharged the greater of the two burdens of proof. The defendants have shown by affidavits and records that the price was established after lengthy, competitive negotiations conducted at arms length by United Artists and NTA with the controlling stockholders, officers and directors of AAP; that the price was the higher of the two competing offers; that AAP's directors unanimously approved the price; that the stockholders of AAP, after a full and complete disclosure of the details of the transaction in a 37 page printed prospectus-like Report, voted overwhelmingly in favor of the transaction; that the price was in fact accepted by the holders of all but approximately 3% of the stock outstanding and by all but about 5% of the holders of AAP's debentures and warrants; that the plaintiffs were given the same opportunity to sell their stock as was afforded to all other stockholders; that the value of the film library depended upon the uncertain timing of the release of more modern motion picture films for television exhibition; that the price was more than 16 times greater than 1957 earnings per share and was higher than any price at which the stock had been publicly traded for more than a year preceding the transaction; that the price was almost double the book value of the stock; and that by purchasing the bulk of AAP's shares and using them to purchase AAP's assets, instead of purchasing the assets for cash, UAA afforded to AAP's stockholders very substantial tax savings. We are satisfied that a prima facie showing of good faith and fairness was made by the defendants.
Since the defendants thus undertook and discharged the greater burden of proof, we are not required to decide whether United Artists' control of Gotham disqualified the stock held and voted by Gotham from being counted in arriving at the stockholder ratification which would have reduced the burden. Accordingly, we express no view on that question.
The defendants' burden having been thus discharged, the burden shifted to the plaintiffs to come forward with further evidence to demonstrate that there is a genuine issue of fact on the question. The plaintiffs have failed utterly in this regard. They have presented one affidavit, being that of one of the plaintiffs who is an attorney and accountant. The affidavit provides no facts. It is limited to the argument, opinions and projections of the affiant as to the value of the assets and stock of AAP, based entirely upon the contents of the Report which had been distributed to AAP security holders with United Artists' offer.
It is not sufficient for the plaintiffs to aver, to imply, to suggest bad faith or improper motives at the summary judgment stage. If the plaintiffs had proof of fraudulent acts or motives, they were obliged to come forward with it. "In such a situation, a duty is cast upon the plaintiff to disclose evidence which will demonstrate the existence of a genuine issue of fact * * * if *508 summary judgment * * * is to be denied." Frank C. Sparks Co. v. Huber Baking Co., 9 Terry 9, 48 Del. 9, 96 A.2d 456 (1953).
We conclude that the defendants were entitled to summary judgment in their favor upon the fairness issue.
The second prong of the attack upon the transaction is more technical. It consists of the contention (a) that the transaction is ultra vires because in violation of Article Fourth of AAP's Certificate of Incorporation but, if not, (b) the transaction is invalid, nevertheless, because it was not authorized by any provision of the Delaware Corporation Law.
Article Fourth provided:
"In the event of any liquidation or winding up of the Corporation or distribution of the assets by way of return of capital (whether voluntary or involuntary), the holders of said twenty-five (25¢) Par Value Common Stock shall be entitled to receive the complete distribution of the assets of the Corporation in pari passu."
The plaintiffs argue that this Article was violated because the transaction amounted to a "distribution of the assets by way of return of capital", upon the happening of which the stockholders should have received "the complete distribution of the assets * * * in pari passu". The answer to this is two-fold: First, the "distribution of the assets" referred to in Article Fourth must be construed, we think, to mean distribution of all the assets. This appears to be clear from the third position of that language in the series of terms connected by "or", consisting first of "liquidation" and secondly of "winding up". The reference to a "complete" distribution is also meaningful in this connection. Since AAP remained a viable corporate entity with almost $2,000,000. in its treasury, there was no such final distribution of assets as is contemplated by Article Fourth. Moreover, distribution of a film library in pari passu is not within the realm of reasonable feasibility and the corporate charter will not be construed to require that which is practically impossible.
As to a statutory sanction for the transaction, § 160 of the Delaware Corporation Law (8 Del.C. § 160), furnishes ample authorization. That section provides:
"Every corporation organized under this chapter may purchase, hold, sell and transfer shares of its own capital stock; but no such corporation shall use its funds or property for the purchase of its own shares of capital stock when such use would cause any impairment of the capital of the corporation."
Implicit in § 160 is authorization for a corporation to use its property for the purchase of its own capital stock if such use will not impair its capital. The plaintiffs concede that there was no ultimate impairment of capital in this case. They argue, however, that the transaction was not a "purchase" because AAP received cash and an assumption of liabilities as well as its own stock. We find no merit in this contention. We conclude that § 160 provides statutory authority for the transaction. We do not reach the question of whether § 271[3] of the *509 Delaware Corporation Law, upon which the defendants also rely, provides further statutory authority for the transaction.
We think that the defendants have demonstrated that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. The judgment below is affirmed.
NOTES
[1] It was announced in the Report that Hyman would not tender his 124,000 shares because of special tax problems. His shares were voted in favor of the transaction, however.
[2] It is noteworthy, and perhaps significant that this appeal comes before this Court in 1965 in a case commenced in 1959 challenging a transaction which occurred in 1958. It appears that this status of the case results principally from lack of diligence on the part of the plaintiffs in the prosecution of their cause.
[3] 8 Del.C. § 271 provides:

"Every corporation organized under the provisions of this chapter, may at any meeting of its board of directors, sell, lease or exchange all of its property and assets, including its good will and its corporate franchises, upon such terms and conditions and for such consideration, which may be in whole or in part shares of stock in, and/or other securities of, any other corporation or corporations, as its board of directors deems expedient and for the best interests of the corporation, when and as authorized by the affirmative vote of the holders of a majority of the stock issued and outstanding having voting power given at a stockholders' meeting duly called for that purpose, or when authorized by the written consent of the holders of a majority of the voting stock issued and outstanding."